Welcome. We have one argument this morning. Menzies v. Powell, 19-4042. I guess we're ready to start. Ms. Lair, are you prepared to begin? Yes. Go ahead. Good morning. May it please the court, Lindsay Lair on behalf of Appellant Ralph Menzies. In his dissent in the direct appeal, Justice Stewart said, this case has been mishandled from the beginning. And he was right. In a case where somebody's life is on the line, portions of transcript are missing from critical stages of the trial. The state withheld irregularities and identification testimony and counsel never objected to the due process violation. A jailhouse snitch testified without ever being thoroughly cross-examined. During the medical examiner's testimony, a juror fainted, coinciding with an area of transcripts that is also missing. Another juror received a phone call indicating that Mr. Menzies was responsible for another murder. And still another juror had a nervous breakdown during the trial. In the penalty phase, counsel failed to begin their mitigation investigation in earnest until two days before the penalty phase began. And as a result, missed critical red flags, including that Mr. Menzies suffered from organic brain damage. Then in the sentencing, the judge Suis Bande applied aggravators that the state court agreed would be inappropriate to apply in this case. To allow a person to be executed on such a record is not justice. There are a lot of issues before the court in this case. I imagine we won't have time to get to all of them today. My plan was to start with the transcript claim and then to discuss the penalty phase ineffectiveness claim and the uncharged aggravators claim, as well as other issues as time permits. But of course, to the extent the court would prefer to discuss other issues, I'm certainly happy to do so. Turning to the transcript claims, I'd like to start with the record of voir dire and the state court's handling of that aspect of the claim. And I'd like to highlight a particular area of the state court's decision. In this opinion in Menzies I at page 232, the state court quotes a passage from voir dire in which prospective jurors are being asked about their experience with being victims of violent crime. And the state court notes that one juror seems to have given an affirmative answer, but that's not a problem because he was dismissed for other reasons. And then the court acknowledges that the court says the difficulty is that it's not possible to tell what if other jurors spoke in the gap where there's no transcript. Nonetheless, the court says it's not prejudicial. So this was both an unreasonable determination of the facts and an unreasonable determination or application of Supreme Court precedent. It's an unreasonable determination of the facts because it is simply not possible to determine that nothing prejudicial occurred in a record that the court has never seen. And then it's an unreasonable application of Supreme Court precedent because the Supreme Court has said that where a complete transcript is not available, the state has to provide a record of sufficient completeness to allow for adequate and effective appellate review. And in Evis v. Lucie, that comes from cases like Griffin and Draper. And in Evis v. Lucie, the court discusses its decision in Griffin and it elaborates a little bit. And what the court says is that where the state has set up a system of appeal as of rights, which is the case here, there is a due process violation where the court has refused to give each defendant a fair opportunity to have review on the merits. And where there is no record of proceeding, where there are gaps in the proceeding, the defendant is not getting that fair opportunity to have review on the merits. Ms. Slayer, is that because your contention is that when in Menzies I, the Utah Supreme Court says that the four dire omissions were not prejudicial, it's because there may have been other passages that were omitted that would have given rise to having disqualified jurors actually sitting, but you're not able to determine that? Correct. Yes. Now, how does the burden play into this? Now, if you're arguing, let's say, put the AEDPA aside and you're a, say, either a petitioner in state post-conviction or in federal relief, you would have to show, wouldn't you, that the omissions were prejudicial, that there is at least some reasonable belief that there was a juror that sat improperly. And when you include 2252, that it's your burden, is it not, to prove that there was an unreasonable determination of fact by the Supreme Court of Utah in Menzies I, based on the evidence presented. So, if there is a gap in the record that makes it impossible to conclude that there was prejudice, how can we say that the Utah Supreme Court's determination that there was not prejudice was the burden? So, what the Supreme Court has said is that where there's not a transcript, the burden is on the state to show that an alternative will still provide for adequate and effective appellate review. And so, here, where there are these gaps that cannot be filled, but by the time they were addressing this issue, none of the parties any longer had a memory of happened. So, where there are these gaps, the state did not provide an alternative. To the second part of your question, it does get tricky with applying the ADPA, but here, I think particularly with the factional determination, the reason that that's unreasonable is that the state court simply cannot make a determination one way or the other that it is prejudicial or that it isn't on the basis of a record that it has never seen. It can't know what's in that record. And throughout the opinion, the state court, including the area I just talked about, one of the things they say is, well, if something prejudicial had happened, trial counsel would have objected. And there's no objection, so nothing prejudicial happened. What that ignores is that sometimes everyone in the courtroom misses something. And in particular, in a capital case, that's why courts do plain error review. And that plain error review is particularly critical in a capital case. And the Supreme Court has proven in Jobs v. Vance that in a capital case, review on a complete transcript is critical. And the reason for that is, it makes sense, even if we could assume for the sake of argument that it's more likely than not that nothing prejudicial happened in those gaps, that Baudire proceeded as normal, everything was fine. But even on a more likely than not standard, that leaves a 49% chance that we're wrong, that something prejudicial did happen, even if we take it down to a 25% chance. But doesn't the 51% chance show that the Supreme Court of Utah was not acting unreasonably? Not in a capital case. No. In a capital case, the Supreme Court has very clearly said that appellate review of every aspect of the proceedings is critical. And so no, in a capital case of 51% chance, particularly with no basis of knowledge, they just say that. There's no basis in the record for concluding that. And so when their conclusion is based on speculation or assumption, it's not reasonable. It has to be supported by the record. And here it is not. And that I think is why it is an unreasonable determination of the fact. It's also an unreasonable application of the law, because that's not the standard that the Supreme Court has set out. And there are other areas of the transcript where the same thing happens, where the court doesn't consider whether or not the record was sufficiently complete. So an example that comes to mind is where the juror fainted. And the Supreme Court acknowledges that there is a portion of transcript completely missing, and we don't know how much. And what the Utah court said is, essentially, Mr. Menzies can rely on his imagination to come up with claims for this area. If errors occurred in this area, then he can bring them to the court and will pretend that they were preserved. But that puts the burden on Mr. Menzies to come up with something and does not allow him to appeal on the actual record of his case. And that... Can I ask you about 2254 D1? Now, you mentioned that there is Supreme Court precedent when there is no transcript. I didn't see anything in the briefing from either party that there was a Supreme Court precedent on the kind of issue that we have here, where there is a transcript, but there are omissions. There's a... The court reporter relies on a note reader and etc., and that there are omissions and unquestionably flaws. Now, if there is not a Supreme Court precedent that addresses a situation like ours, aren't we compelled, whether we like it or not, to say that there is not clearly established federal laws determined by the Supreme Court under D1? So first, I would say that there is Supreme Court precedent that Griffin and Draper and Dowd and the other cases that we said in our brief, particularly with respect to the areas where there are omissions or where there are no notes, but there is transcript. I think those would also fall into that area where we still apply... Those cases dealt with a transcript not being provided in total, but it's the same thing. Where there's an omission, there is no transcript. I would also point to Dobbs v. Vance, which is a 1993 case where a portion of transcript was missing. It was then uncovered much later, and the appellate court refused to consider it because it hadn't been a part of the record earlier, and the Supreme Court said, no, you can't do that. In a capital case, it is critical to consider the defendant's complete record. I think that ties in with another line of cases that I would argue is clearly established here, and that is Gardner and Gregg and those cases that... Vietney-Stevens and those cases that talk about appellate review being critical to the constitutionality of a state's death penalty system. Even in Gregg, the court talks about how part of the reason that the Georgia scheme is constitutional is because they have this mandatory appellate review. That is a critical portion of their system being constitutional. Here, where there is not transcript of areas or where the court reporter didn't take notes of portions, and then the note reader invented transcripts, the state court simply is not able to provide that complete appellate review. Let me ask you this. Have you addressed preservation of these issues? For example, you talked about Robert Guadir, but that wasn't raised before this appeal, was it? The portion of Guadir that I just talked about actually comes from the state court's opinion. Right. Did you raise this in federal district court? Yes, we did discuss Guadir in federal district court. And the problems with the transcript there? Yes. There are many examples throughout Guadir where this is an issue. One of them, there's a place where the court reporter stopped taking notes and wrote the letter DLRB. But in the original transcript, there appears questions and answers from jurors that were not in the court reporter's notes. They bear no relationship to what was actually said at Mr. Menzies' trial in his Guadir. And then the other similar issue is the, again, with the court reporter ceased taking notes and the note reader effectively copied and pasted questions and answers from the judge and from the answers from the prospective jurors, and they appear repeated. They repeat themselves in the Guadir transcript. So in those instances, we don't know what the jurors actually said. The other point I was going to make about the clearly established federal law is I think the Supreme Court's opinion in Edith v. Lucy is really helpful here because the court specifically discusses its decision in Griffin. And what the court says there is that Griffin and that line of cases rely on both an equal protection analysis and a due process analysis. And the court explains that the equal protection analysis has to do with how the state sets up and the fairness between the state and the individual in question, regardless of how other individuals are treated in the same circumstances. And the court says that in Griffin, there was a due process violation because the appeal was decided in a way that was arbitrarily with respect to the issues involved. And that's the same thing that happens here. In those places, particularly where transcript is missing, the decision of the state court is arbitrary because it cannot be based on the record. It cannot be based on what actually happened in Mr. Menzi's trial. Why don't you proceed to another issue? I think we understand your point. Okay. So I would like to turn to the penalty phase ineffectiveness. And what I wanted to say about that claim is that what's important here is that the trial counsel didn't really begin their mitigation investigation in earnest until two days before the penalty phase started. A couple of times, Ms. Slater, and you certainly said that in your briefs. And I tried to track in the record what you based that on, and I did not see anything. I saw where Ms. Wells had talked to, I think it was either the aunt or the sister, you know, the weekend before. But, and I saw your references to when Dr. DeCaria, the clinical psychologist, started. But can you tell me precisely, and this is not a pop quiz, if you recall in the record where I can find record substantiation for the fact that Ms. Wells did not begin her mitigation investigation until the weekend before. It seems hard to believe that she presented two expert witnesses, Dr. DeCaria, the educational psychologist, the prison social worker, the sister, I mean, yeah, the sister, the aunt. Where can I find that in the record? I can't conjure up a cite for you off the top of my head. But I can tell you that I think, I don't want to get too caught up in the semantics or the language. You know, we don't dispute that they hired Dr. DeCaria 14 months before trial, and he went and had a one-hour interview with Mr. Menzies. What they didn't do was review records or interview any that they did not interview the sister until two days before. And I believe she says that in her declaration in post-conviction. And I also believe that in post-conviction, they were using the billing records as well, like counsel's time records. But it's not disputed that they did not review records that they had. They knew the state would use. They had Penalty Phase Exhibit 8 was Mr. Menzies' entire prison file that contained some records from when he was a juvenile, and including a report indicating that it seems that he might suffer from organ brain damage. They did not review that file, and that they stated on the record at trial. I can give you a site for that one. It's transcript 2892. I'm not sure the exact date, but that's the page number. And they say on the record they haven't reviewed that file. And that is a critical thing for them to review, and that's what the Supreme Court is going to use this. There is no excuse to not have reviewed it. And in particular, in this case, it contains this red flag about brain damage, which had they reviewed it, they could have been investigated and appropriately prepared their experts. And that evidence would have been important not just in mitigation, but also to help explain some aggravating evidence. For example, Mr. Menzies had previous diagnoses of antisocial personality disorder. That's a common misdiagnosis when there is organic brain damage involved. So, it would have helped them on both sides of the scale had they investigated that. So, the other claim, if it's okay if I jump to another one. The other claim I wanted to touch on was the uncharged aggravator claim. No, no, no. Well, okay. The Utah Supreme Court, as I understand its opinion, said that the failure to produce organic brain damage evidence was harmless. That it would have more likely hurt your client with the injury than helped. Because if it's organic, it's incurable, and it does present a continuing threat. How do you respond to that? The United States Supreme Court has repeatedly said that brain damage is very powerful mitigation. They say that in Sears and Porter and Rompilla and Jefferson v. Upton. Well, it may be. It may be. But in the circumstances of this case, are they going to say that it was unreasonable of the Utah Supreme Court to say that in this case, it would be more damaging than helpful? When they said it's important, they've just been focusing, I believe, on the deficient representation element of inadequate representation. And said that attorneys need to look into organic brain damage, because that could be important. And it was deficient performance not to do that. Have they ever held that it was necessarily prejudicial that organic brain damage evidence was not presented? Has the Supreme Court ever said that? I don't know that they've used the word necessarily. They did find prejudice in Porter and in Sears, based on counsel's failure to investigate evidence of brain damage. In those cases, had the state courts addressed the issue of prejudice? And they said that they, presumably, the state court said it was harmless. Otherwise, there wouldn't be a case before the Supreme Court. Have they ever said that a state Supreme Court was unreasonable in ruling harmless the failure to present organic brain damage evidence? I don't think I can say with certainty that they definitely say that in Sears and Porter. I can say that those are post-ADPA cases. So, I mean, they are decided under the ADPA. Well, then the one possibility is that the state court never addressed harmlessness. That's possible. I don't recall off the top of my head. Okay. Thank you. Did Dr. DeCario review Exhibit A? No. No, counsel never gave that to any of their experts, and they themselves never reviewed it. Is that in the record? Is it clear from the record that none of their experts, including the psychiatrist, they did not call as a witness? Is it clear in the record that the attorneys never provided any of these potential experts with the records that reflect some concern about organic brain damage? My recollection is that the experts are asked about what they've reviewed. But the potential witness, the psychiatrist, didn't testify, did he? I'm saying he. I think it was a he, the psychiatrist. How do we know that the psychiatrist did not get that information? I don't think there's any indication in the record that he did or that he would have gotten any different information than the others did. I don't recall a specific site for that. Okay. Well, the reason I'm asked about the witness who didn't appear is perhaps the psychiatrist looked at the evidence that I think he's probably got organic brain damage, and after thinking about it, defense counsel said, I don't think that would help us. I think that would hurt us. So let's not pursue that. We don't know anything about that, do we? Right. But the problem is that they hadn't done the investigation to be able to support that kind of strategic determination. And that's what the court tells us in Wiggins, and again, in Rompia, and all of those cases that in order to have a reasonable strategic decision, that there has to have been an adequate investigation. Why would it be inadequate to say it's not going to help us to explain Mr. Menzies' behavior on the basis of organic brain damage? We think that maybe that would work in some other jurisdiction, but in Utah, that's going to be held against Mr. Menzies, because it shows he can't be cured. And we think we have a better chance with the jury saying that, yeah, he's got serious problems, but they can be treated, so he won't always be a threat to society. Because they hadn't done the investigation to support that. Well? You can't make a strategic decision when you don't have any information. And when you don't start, when you don't interview witnesses, when you don't review records, when you don't do all of the things that are constitutionally required of counsel in the penalty phase, you don't have the basis to make that strategic decision. And the Supreme Court has said that in Wiggins and countless other cases. This court talked about that in Wilson v. Thurman, that any, that it has to be based on a reasonable investigation. I was hoping to save a little time for rebuttal. Well, go ahead and talk about your third issue that you have, and then we'll see whether you get rebuttal later on. The death of the cases are important. We want to be fully informed. Okay. So the third issue I wanted to talk about was the uncharged aggravator issue. And so here the state court found that all evidence to the contrary, the, and even though they agreed that it would have been error to apply the heinous, atrocious, and cruel aggravator in this case, but they found that that's not what the trial judge did. That conclusion is by the record. The trial judge explicitly references the statute with the subsection. It's hard to imagine how he could have been more straightforward in what he was doing, that he was applying that aggravator. So that is an unreasonable determination of the fact. And then the other aspect I wanted to highlight is that the state court never addressed the other aggravators that the trial court also applied to Asante. And so it didn't include those in its calculus as to whether there was harm. Judge Harts, can I ask a question? Yes. With regard to the aggravators, the uncharged aggravators, I'm sympathetic with your argument that you've made as a legal matter that there's, you know, that at least in the selection stage, even the government is arguing that the aggravators only become pertinent in the eligibility stage. And I understand your argument that the trial judge specifically referred cited provisions in the statute with regard to the specifically referred to the aggravators. Is the problem one of notice that, like most challenges, even in other contexts where, say, a prosecutor or a trial judge relies on things that had not been charged, the problem, it originates from a lack of notice that the defendant may have done the selection stage, the trial judge may and would rely on aggravators. Is that the problem? Right. Yes. So we're not saying that these additional aggravators couldn't have been charged. I mean, we agree with the state court that heinous atrocious and cruel was not appropriate in this case, but the state could have charged other aggravators. They just didn't. And so, yes, it's a due process problem of having notice and an opportunity to be heard to respond to those My question is, what would you have done differently? What additional evidence would you have presented? What additional arguments or different arguments would you have presented to the trial judge? Because really all of these aggravators, heinousness is a prime example. Well, heinousness is an identifiable aggravator in the Utah statute. On the other hand, in the circumstances, the seriousness of the crime are unquestionably things that in the selection stage he would present legitimately that a trial judge would refer to. And so, what difference did it make in terms of prejudice from the lack of notice that the trial judge was going to rely on these aggravators at the selection stage? What would you have done differently? So I should clarify, it's not just an issue of notice, but it's also that the aggravators have to, what the Supreme Court has said is the aggravators have to distinguish in a principled way cases where the death penalty is imposed from cases where it is not. And where invalid or inappropriate aggravators are applied, that is not happening. I think it's hard to say from an evidence perspective, because as you said, and as the Supreme Court found, the facts of the crime were still in the record. That was still a basis for the decision. But the problem is that if we equate the facts of the crime with heinousness as an aggravator, as opposed to what the court referred to as colloquial heinousness, there has to be a distinction between those two things. Otherwise, the aggravator isn't doing the constitutionally required work. But the constitutionally required work isn't the eligibility phase. But it happens at both phases. And the Supreme Court made that clear in Tula-Leopold, where it said that it has to be both eligibility and selection has to be, they have to ensure that the process is neutral and principled. And that if, and then actually the Utah Supreme Court said the same thing in Parsons. They, in Parsons, he had actually pled guilty to aggravated murder. And all of the aggravators in his case came in in the penalty phase. And the court still said that each aggravating factor has to genuinely narrow the class of persons that's eligible for the death penalty, whether they're applied in the eligibility phase or the selection phase. Did you argue for now, before Judge Bachrach raised the issue, had you argued earlier in the proceedings, either in state court or in federal district court, that the defense was handicapped by not being alerted soon enough to this use of the aggravators and therefore could not prepare and produce evidence to rebut it? Yes, we argued that it denied him an opportunity to rebut the aggravators. In federal district court and in state court? I believe so. Okay. Thank you. Okay. Thank you, Ms. Layer. Ms. Riley? Thank you, Your Honor. May it please the court, Aaron Riley from the Utah Attorney General's Division. I'd like to start with the penalty phase claim of ineffective assistance of counsel. Mr. Menzies argues about the timing of when counsel began preparing the mitigation investigation. Frankly, the record's not entirely clear about some of that and when they might have done certain things. But the timing is not crucial. The actual performance of counsel is the critical question. Menzies has never shown how the timing of the investigation prejudiced him. Counsel had three experts evaluate Mr. Menzies. They called his sister and his aunt to testify. Dr. DeCaria also elaborated on the terrible circumstances of his childhood at the end and the sister had talked about. As to the issue of organic brain damage, admitting evidence of organic brain damage would have been contrary to trial counsel's strategy. But what do you say to Ms. Layer's argument that that presumes that there was a strategy? Now, Ms. Wells didn't know that there was ultimately organic brain damage, at least according to Dr. Copper, because he didn't review Exhibit A. He didn't have Dr. DeCaria review Exhibit A that she says would have given a red flag to Dr. DeCaria that there was a reason to investigate the potential for organic brain injury. And then in Littlejohn, of course, our court has said that this is one of the most gravest indicia of mitigation organic brain injury. So how do you deal with her argument that there was no strategy because there was no investigation about the possibility elucidated in Exhibit A? There were two answers to that. First of all, there clearly was a strategy. When you read defense counsel's penalty phase, their strategy was clearly to establish that Mr. Menzies had the ability to change and could change and therefore was a candidate for prison rather than the death penalty. And that is strengthened by the fact that he was evaluated by a psychiatrist, but Menzies counsel specifically declined to call him at trial. And the reason they declined to call him is because he would have testified that Menzies' violent nature was unlikely to change. So they made a strategic, reasonable decision not to put on evidence that he would be unlikely to change. And organic brain damage would have supported the thing they were trying to avoid, which is to establish that he was unlikely to change. But how could they make that strategy with regard to organic brain damage? It's one thing to say couldn't change because of the psychological status, but to say couldn't change because there's organic brain damage introduces another element. Some jurors may well think, and really you just need one juror, some jurors may think this person is not as responsible as another person who committed the same offense because his brain was damaged and he was more like an animal, couldn't make a sort of human decision to not engage in this awful behavior. And if the defense counsel had not explored whether there was organic brain damage, how can we defer to the defense strategy based on ignorance? Well, for two reasons. Because he was evaluated by three experts, current experts prior to his trial, and none of them determined that he had organic brain damage. But secondly, organic brain damage is a double-edged sword. Certainly it can be mitigation, it can make the jurors feel sorry for him, feel that maybe he's not as responsible, but it can also cause them to be concerned that he won't change and that he will be continued to be dangerous. And counsel may... So say a couple of things, let me interrupt you at this point before we get to 12 things I need to ask you about. First, okay, say eight jurors would find all you need is one to prevent the death penalty, don't you? That's true, but we're not... So the fact that it's a two-edged sword might make a difference if you need a unanimous jury on a point. But if it's a two-edged sword, because most people would find this bad, this would be harmful to the defendant, but a smaller percentage would find it helpful. All you need is a few people to find it helpful. That's the first thing. The second thing I wanted to ask about is none of the experts who examined the defendant noted organic brain damage. The part of that may be because they weren't provided with sufficient information. There's stuff in the record from prison, I believe it was, maybe it was school, mentioning the possibility of brain damage. And there's no evidence that that was presented to any of these experts. If you keep experts from being fully informed, they might not make a correct decision. They might not notice something that they would document. So those are two issues I'd like to... A couple of things. First of all, they are experts and they should be able to determine whether he had organic brain damage or not, whether or not there was a sentence in a juvenile record or a prison record from years and years ago saying that there's a possibility that he might have some organic brain damage. Second, we don't know what the psychiatrist reviewed because he never received a report from him because they decided not to call him. And third, we're not deciding what might have been a strategy to use or what some other counsel might have done. We're deciding whether the Utah Supreme Court decision was unreasonable when they determined that penalty phase counsel was not ineffective for proceeding the way that they did. And Mr. established that the Utah court decision was unreasonable or contrary to any United States Supreme Court law. I'd like to move on to the transcript issue. Well, you didn't respond to my other point about harmlessness on the organic brain damage when you said it's a double-edged sword. Saying it's a double-edged sword is itself a double-edged sword. It helps you in one way, but the fact that there's a second side to the sword can hurt you because all you need to do is convince one juror not to vote for the death penalty. So how do you respond to that? It's a reasonable choice not to use it if you're thinking the evidence I have and I'm presenting may convince the jury that he can change. But if I put on evidence of organic brain damage, that might convince one juror that he'll never change and make a decision that the death or convince the judge that he will never change and that the death penalty is appropriate. So it plays both ways in deciding how to proceed. That was a reasonable choice for counsel to make. Does it matter that the selection decision was made by the judge alone rather than 12 jurors? It might play into their decision-making process. It doesn't change the legal status or the reasonableness of their choice in deciding whether that could be damaging rather than damaging. Should we assume, and I'm sorry to prolong before you move to the transcription issue, but should we credit Dr. Topper's opinion that he didn't actually have organic brain injury since that was really undisputed? There's nobody that said that he did not have organic brain injury. They didn't specifically say, no, he doesn't have organic brain damage, but they also didn't say he did have it. So I think that is a conflict in the testimony there. Okay. You're saying, I thought that they did, although maybe not as clearly expressed as one would like, but you're saying that none of the experts called by Mr. Menzies and Habeas said that he had organic brain damage? Well, it is a little bit of a complicated issue because he certainly had some mental issues and but they talked about personality disorders and other types of disorders that he had. My recollection is that they did not specifically say that he had organic brain damage with that exact terminology, but they certainly talked about issues that he had and the sentencing judge considered that and discussed that in his sentencing decision. And go ahead. Sorry. Well, I was just going to, when was the decision made that the penalty phase would be handled by the judge alone rather than by a jury? Was that only after the guilt or was that something that had been talked about and decided before trial? I don't recall how soon that was, but that was a clear decision that Mr. Menzies' counsel made. And Mr. Menzies' counsel were familiar with this judge and made that choice specifically because he was the judge in this case. So that was a reason decision that they made. I don't recall the timing. I think it was before the guilt phase because they did not retain that jury for the penalty phase, but I don't recall the exact timing. Talking about the transcript issue, again, Menzies has not established that he was prejudiced by any transcript errors. There were errors in this transcript, but there's no constitutional right to a perfect transcript. And everyone made efforts to try to resolve errors in the transcript. Menzies' counsel was involved in reviewing, several hearings were held in the trial court, and the Utah Supreme Court noted that the trial judge who presided over the trial was in the best position to determine whether the record adequately reflected the proceedings. The trial judge denied Menzies' motion for a new trial on the transcript issue and said the transcript was sufficiently accurate to afford a full and fair appellate review. And then an entire appeal was held solely on the transcript issue where the Utah Supreme Court carefully looked over all of those issues. They clearly followed United States Supreme Court law as set out in Draper versus Washington and other cases that the constitutional right he had was to a record of sufficient completeness to permit proper consideration of appellate claims. And that is what he received. He has not shown that he suffered any prejudice from any errors in the transcript. Can I ask you a question? I think it's indisputably quite troubling. You know, this is a very fact-intensive trial. You have people like Kim Larrabee, who is certainly an important witness, who is either 50 yards from the hiker or he's 20 to 100 yards from the hiker. We don't know because the court reporter didn't do numbers. We have, as this lawyer said, we have a voir dire. Maybe there was no juror that sat on the case that was subject to disqualification. We don't know because she just stopped. She didn't record it. She didn't even take notes on it. And so you had somebody else fill in the blanks and cut and paste, cut and paste things from police reports. And so when a person's life is at stake, your point is well taken. The ADPA means something. We have to apply it. We have to apply whether it's an unreasonable determination of fact. But on the other hand, how do you just respond to just the underlying concern that is ever-present that how does one go about looking at a trial record to identify how does a public defender in any criminal case go about selecting appellate issues when there is no confidence on any number of things really in the entirety of the transcript? The only reliability is when they go and get on a plane to California and sit with the court reporter and get the judge's memory, the lawyer's memory. It's quite troubling. How do you respond to that? A couple of things. First of all, to read through the actual transcript itself, which the trial judge in the Utah Supreme Court did, and see that some of the errors are not as significant. The second thing, the Utah Supreme Court found that the vast majority of errors did not deal with any testimony during the trial, but with argument held outside the presence of the jury. They found that that was less significant because arguments are relevant on appeal, but mainly in reviewing trial court rulings. And then it has not cited any errors or raised about trial court rulings. And then it's relevant, of course, as to what was preserved and as to the proffer of evidence. But in the one main instance where Menzies argued that there was errors or gaps in the transcript about argument, the Utah Supreme Court cured that problem by saying that they would review any claim that could conceivably have been raised as though it had been properly preserved. In effect, giving Mr. Menzies a bonus, actually, by saying, even if they didn't raise this argument, we're going to let you raise it now on appeal, and we'll address it as if it had been preserved. Now, some of the errors did occur during voir dire. But again, Mr. Menzies has not established any prejudice. And it's important to establish a constitutional violation, he has to show that a biased juror actually sat. He has not done that. How could he? He could do it in two ways in Utah. He doesn't know what was asked, and he doesn't know what was answered. Well, for most of the questions, we do. And in fact, the juror voir dire questions were written down. And the jurors were given a copy of that list of questions. So we do know what was asked. And as to the answers, Mr. Menzies had two opportunities to follow up with jurors that he could have done and did not. He could have requested a 23B hearing at the appellate procedure. How could he have done that? Rule 23B went into effect 17 days after the direct appeal had been filed. It went into effect on October 1st, 1992. He filed his direct appeal brief on September 14th, 1992. Rule 23B-A that went into effect after the appeal brief was filed says that a Rule 23B motion to remand has to be filed prior to the appeal brief being filed. So on the very day that Rule 23B went into effect, he was already out of time to take advantage of Rule 23B. Well, if you read down further through Rule 23B towards the end of paragraph A, it says, upon a showing of good cause, the court may permit a motion to be filed after the filing of the appellate brief. Now, 23B, the passing of 23B was a fairly big issue in Utah. I'm fairly certain that Menzies counsel knew about the passage of it. They could have asked for a 23B hearing. There would have been good cause to say, look, this rule didn't even go into effect until after my brief was filed. Can I ask you a different question? The other argument that Ms. Laird makes on page 16 of her reply brief is that Finlayson addressing the Martinez issue involves situations where there was a different lawyer representing the defendant at trial and on appeal. And Ms. Wells was the same lawyer at trial and on appeal. And we, of course, have case after case after case that says that you don't argue. We won't even entertain an argument for ineffective assistance of trial counsel on direct appeal because, particularly when it's the same lawyer, they have an obvious conflict of interest. So how do you deal with that argument, Ms. Laird's reply? In Utah, that fact is different. Counsel can and sometimes do raise their own ineffectiveness on appeal. But Rule 23B also provides for that. Rule 23B, subsection C says, if it appears to the appellate court that the attorney of record on the appeal faces a conflict of interest upon remand, the court shall direct that counsel withdraw and that new counsel for appellant be appointed. So it has a procedure for that as well. Did Ms. Wells, was Ms. Wells the attorney who briefed and argued the direct appeal? Her name is on the brief. I don't believe she argued. But counsel, Ms. Wells at the time was from the LDA, the Legal Defenders Association, and the appellate attorneys were from LDA as well. And I believe the attorney who argued the appeal was not Ms. Wells, but was another attorney from LDA. But her name's on the brief. Her name is on the brief, yes. Although she was not specifically an appellate attorney, but her name is on the brief with two other attorneys. Let me back up. I read your brief, your supplemental brief, is saying that the challenge to Vore Dyer based on the inadequate transcript was not preserved. Ms. Layer said that that had been argued. Is there some particular point that, well, how do you reconcile that? Did I misread you, or is Ms. Layer wrong, or is there some middle ground? I think, as I recall, that there's some middle ground, that they raised issues about the transcript itself, and obviously those errors had previously been raised. I'm not sure all of the specific arguments were clearly exhausted previously. And of course, just the fact that a claim has been raised is not sufficient. The various arguments and issues have to be raised as well for them to be clearly exhausted. But the other opportunity that Mr. Mendez had, if he thought there were issues with any particular juror who actually sat on the case, was to subpoena him and call him and question him during state post-conviction proceedings, and he never did that. It is Mr. Mendez's burden to establish, to make a showing of prejudice, to overturn a conviction on the basis of transcript errors. He had the opportunity to do that, and he still has not. But that had been unreasonable in this case, really, because of the delay. As I understand, the post-conviction proceedings took place, and I could be wrong, in 2010. That would have been 22 years after the trial. If I'm sitting as a juror and someone calls me to testify about what I said, what I remembered 22 years ago, or anything else that happened 22 years ago, I'd be hard-pressed to remember that. Is that really an adequate substitute, just because of the passage of delay? Well, first of all, when to file a post-conviction petition, again, he could have raised issues in 23B on appeal. He did not. Then when to file a conviction petition is up to Mr. Mendez, and he certainly could have contacted jurors at any point previously. Talking about the one specific issue that he raises, having to do with prior criminal action or crimes against the jurors, certainly they would likely remember that type of argument. The third thing is, as the Utah Supreme Court found, the vast majority of errors in the questioning of the jurors related to questions about capital punishment. Of course, the jurors did not impose punishment. The court did not find those errors highly relevant for two reasons. Because they didn't impose punishment, and also because there were a number of questions about capital punishment. Those questions were very redundant, and so there was not much of a prejudicial effect. It was diminished because the same basic info came in on numerous questions from the jurors. But they were called upon to decide at the eligibility phase which aggravators have been proven. That's certainly true, but they weren't deciding whether the jurors were guilty or not. And then the one final issue where Mr. Mendez talks about a gap in the record when the juror fainted after the medical examiner testified. The court found, and Mr. Mendez has not disputed that, all of the medical examiner's testimony was transcribed, and the court's subsequent discussion with the juror who fainted was properly reported. The part that was not properly recorded was discussion held outside of the presence of the jury. And again, that's a situation where the court said that issue can be cured by assuming that issues were preserved, and Mendez can raise anything he can conceive that could have been raised at that point. Are there other specific things the court has questions about? I thought I'd just touch briefly on the claims of ineffective assistance of counsel at the guilt phase. Why don't you address the notice issue with respect to the statutory aggravator? Okay. And whether there was prejudice to the defendant. As Judge Becker pointed out, the jury found all that it needed to to make Mr. Mendez eligible for the death penalty. The question is whether the judge, by addressing these other aggravators, acted without adequate notice or made a decision without adequate notice to the defendant. And the first answer to that is no, he didn't. When you read the sentencing, the judge starts out by saying, I will start with... I'm sorry, I'm not sure which question you're answering. You say the answer to the first question is no. There was no problem with lack of notice. The judge starts out by saying, I'll start with the nature and circumstances of the crime. And then he goes on to talk about those things that are listed as statutory aggravators. But they are also part of the facts and nature and circumstances of the crime. And in Utah, the Utah Supreme Court has expressly rejected the argument that the sentencer may not consider aggravating circumstances that were not charged in the guilt phase. I don't know that there'd much dispute about that. But when the judge specifically doesn't do that, when the judge starts, when he says, okay, I'm going to go through the circumstances. Okay, number one, I'm going to go through the aggravator with the heinousness. Then I'm going to go through the aggravator F about the commission of the crime for pecuniary gain. Now I'm going to go to H, the actor was convicted of a felony involving the use of a threat or violence to a person. Your dichotomy, your binary setup framework to the statute makes great sense to me. And, but the judge just didn't do that. The judge put a thumb on the scale by saying, I'm not going to just talk about the aggravated circumstances. I'm going to talk about the and understood that no, he's not supposed to go through the aggravators. We wouldn't have a problem, but the problem is that he relied not on the circumstances, but on the aggravators. And that I think based on the framework that you've elucidated is contrary to what he was supposed to have done. Again, I would disagree your honor under Utah's sentencing statute. The judge is allowed to consider those statutory aggravators, even if they weren't charged in the guilt eligibility phase. So there's two reasons here that even if any error occurred, it was harmless error first, because he's allowed to consider statutory aggravators, even if they weren't charged in the eligibility phase. And that's what he did here. And the that's what the statute says. He can consider any statutory aggravators that are applicable. And the second thing is that he can consider nature and circumstances of the crime. So just because things are statutory aggravators, they're also part of the facts and circumstances of the crime. And certainly Menzies was aware of that. I see that my time has run out. Does the court have any other questions for me? Thank you. Ms. Slayer, let's try three minutes and see if you make the points you need to in that time. Okay. I'm going to go in reverse order if that's okay. On the uncharged aggravator claim, I just want to say that, which is a case that says that aggravators don't have to have been charged in the guilt phase to be charged in the penalty phase. It does not say that they don't have to be charged at all. In that case, the jury, the aggravators were charged and the jury found them in the penalty phase. And that is what the Utah Supreme Court said was acceptable. And in this case, the court agreed that with respect to the heinous, atrocious and cruel aggravators, that this was not an appropriate case for that. So the only question is whether or not the judge applied it. With regard to the transcript claim, I want to make a couple of points. One, so the point was made that the trial judge is in the best position to determine if the transcript was accurate. The judge agreed that portions couldn't be reconciled. That's why he certified three versions of the transcript to send to the Utah Supreme Court. So nobody in this case thought that all of the errors could be taken care of. And then I would point to one error. So some of our claims we didn't get COAs on, so these transcript issues don't appear in our merits briefing. But one example is that after all of the prejudicial events happened with the jury, jurors were again voir dired. And there was one juror who was asked if she thought she could be impartial. In the original transcript, she said, I think so. In the corrected transcript, she says, I don't think so. So that, we don't, I mean, that's one area that definitely impacts Mr. Troubling. With respect to Rule 23B and some of those questions, the Supreme Court, the Utah Supreme Court specifically said in this case that counsel should not have raised ineffective assistance of counsel. They say that in Mendee's post-conviction opinion. I don't recall the page, but it's towards the end. They specifically say direct appeal counsel was under no obligation to raise ineffectiveness claims. And similarly, with respect to the transcript claim, they had a hearing on this where they went through all of the errors. There wouldn't have been, they had addressed it. It had been appealed. And similarly with PCR, raising it in PCR, it was already raised and decided it would have been procedurally barred in post-conviction. And that's three minutes. That's three minutes, but address the organic brain damage, if you wanted to respond on that at all. I did. And so I had a couple of things. One was that just on the timing, the state's right that it's not the timing in and of itself, it's what happens as a result of the timing. And this court has talked about that in Wilson v. Thurman, but in the rush to prepare, counsel will miss, there will be unnoticed and untapped resources is what the court said. And in Wiggins, the Supreme Court found deficient performance where counsel abandoned their investigation, having acquired only rudimentary knowledge from a narrow set of sources. And that is precisely what happened here. The other point I'll make just with respect to the issue of the experts and that is that there were also three experts in Rompea, but because counsel had not prepared those experts, the court still found deficient performance. And particularly with brain damage, it requires neuropsychological testing to confirm brain damage. So a general psychologist is not necessarily equipped to do that, but if you flag the issue for the psychologist, they might be in a position to offer some guidance. And I think with respect to the double-edged sword, the Supreme Court has never endorsed that argument, nor has this court. As Judge Bakarek said in Littlejohn, this court said it was among the most powerful mitigating evidence that counsel can offer. I think that's it. Thank you, counsel. Can I ask a question? Unless you want to ask a question. Well, I don't want to ask any more questions. I'll let you ask a question if you'd like. Well, thank you, Judge. I just wanted to ask you, Dr. Copper is the only doctor that found that there was actually organic brain injury. A reading of Exhibit A, and I don't have it in front of me, I may be wrong, was that there was some indication that he might have some sort of neurological brain injury. But Dr. Cochler, you mentioned that it can only be found after neurological testing that presumably was available 22 years after the trial when Dr. Cochler conducted that testing. But at the time of the trial in 1988, when the deficiencies in the penalty phase counsel allegedly took place, how do we know that there was this neurological testing that was available so readily 22 years later that would have allowed Ms. Wells to initiate neurological testing to find organic brain injury? Is there anything in the record that would suggest that even if we overlook procedural default that Dr. Cochler's report was done in the state court record, even if we get past that, how do we know that Ms. Wells could have, or Dr. Correa, or a neurological psychiatrist could have conducted that testing found at 22 years prior to Dr. Cochler? Sure. So neuropsychological testing was definitely available at the time. People were diagnosing things like SASD and brain injuries of that nature as early as the 70s. I don't recall off the top of my head what's in our records specifically about that, but Rumpia is that that case was a 1989 trial. So very similar timing. So yes, the testing was definitely available. Thank you. Any other questions? Thank you, counsel. Case is submitted and court is adjourned.